Filed 2/24/14  P. v. Waiters CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C067669 |
| Plaintiff and Respondent, | (Super. Ct. No. SF111345D) |
| v. | |
| ANTHONY VINCENT WAITERS, | |
| Defendant and Appellant. | |

When an emaciated, filthy, and terrified 16 year old with a chain on his leg escaped into a gym seeking refuge, it was shockingly apparent he had been beaten, burned, starved, sliced, and shackled.  His three adult caretakers eventually pleaded guilty to torture, aggravated mayhem, and other sordid crimes that occurred during the many months they held him captive.  The essential question posed to the jury in the case before

1

us was whether the next-door neighbor, Anthony Waiters, perpetrated or aided and abetted the host of horrific crimes against the boy, Kyle Doe.

The jury believed Kyle's testimony that defendant Anthony Vincent Waiters was a key participant and found him guilty of torture, aggravated mayhem, corporal injury to a child, felony child abuse, false imprisonment by violence, assault with caustic chemicals, and criminal threats. Defendant's skillful appellate counsel raises a huge number of seductive, abstract legal issues, none of which leads us to conclude that defendant's fundamental right to a fair trial was compromised so as to require reversal. Nevertheless, we will carefully consider defendant's challenges to the exclusion of evidence of his neighbors' guilty pleas, the jury instructions that were given as well as those that were not, the prosecutor's closing argument, the sufficiency of the evidence, and the correctness of his sentence.

Resolution of the many issues posed by defendant requires, as always, a scrupulous study of the record. Examination of the record leads ineluctably to the conclusion that the trial provided defendant, although not perfect, was fair and the verdicts are supported by the evidence. The record does not answer the haunting question of why these four adults perpetrated such unspeakable atrocities.

## FACTS

*Kyle's Story*

For reasons not disclosed in the record, Kyle began living with Carmen Ramirez, a friend of his mother, when he was eight years old. They are not related. Carmen abused him. Though he earned a black belt in karate or taekwondo, he stopped going to school when he was 11 or 12. Carmen's daughter eventually called the police, Carmen went to jail, and Kyle lived at a receiving home for three weeks before he ran away. Unfortunately, he reunited with Carmen.

Soon, Carmen left him with one of her friends for a couple of months in Pleasanton. The friend accused him of stealing. Carmen then moved him to the home of

2

Michael Schumacher and Kelly Lau and their four children in the city of Tracy. Kyle did not go to school while he resided with the Schumacher family. He was forced to dress and feed the children, change the baby's diapers, clean the floors and the bathroom, and perform other household chores. He had no friends and he never went anywhere.

Carmen moved in about January of 2008 and the abuse gradually escalated. After moving in, Carmen began to hit Kyle. It is difficult to reconstruct a precise chronology because Kyle remembered specific incidents but not exactly when they occurred. The indictment charged crimes over a period of time. What follows is a rough approximation of the deteriorating course of events from the beginning of 2008, when Carmen moved into the Schumacher residence, until Kyle's escape and treatment in December 2008.

Once Carmen moved in, defendant began coming over to visit about two or three evenings a week. Michael and defendant often drank together. They both enjoyed sports, particularly football, and defendant coached a youth football team.

Initially, Kelly and Carmen began slapping Kyle, but then the violence escalated. They hit him with a mallet on his hand and a belt all over his body. Kyle remembers that after defendant's brother came to visit on the Fourth of July, the abuse escalated in degree and frequency. The first time defendant hit him he "punched me a couple times" in the face with his fist. Defendant brought over an aluminum bat and told Carmen she could use it on Kyle. Carmen used it to hit him "everywhere," then Kelly joined in, and they both used the bat to strike Kyle in defendant's presence. During the hot summer, Kyle was forced to sit in the sun for the entire day in the backyard. For a while he slept in the garage with no pillows or blankets.

It appears that summer Carmen and Kelly began to tie his hands together by placing zip-ties around his wrists. They would tie his ankles together with zip-ties so he could not walk. While he was zip-tied, defendant, Carmen, and Kelly would hit him. Defendant hit him with the bat. Kyle told the jury that defendant hit him "[p]retty hard," "so hard I couldn't use the body part that he hit." He estimated that defendant hit him

3

with a bat once a week. Kyle explained that he did not resist, fight back, or tell anyone because he was afraid he would be hit even more. He was not allowed to eat. Yet he figured out how to get out of the zip-ties to get food. Kelly and Carmen poured lighter fluid on him about five times.

Kyle recounted a number of abusive events that occurred before they chained him to a table next to a fireplace. One night defendant came over with a boxing glove and hit him. He hit his head on the fireplace and was knocked out. His head bled. On other occasions, defendant would hit him with the bat with what appeared to Kyle to be full force. Meanwhile Carmen and Kelly would hit him with a belt and use the belt to choke him. One night, defendant was drinking with Michael at the house and someone tied a belt around Kyle's neck. They were all hitting him with the bat.

In approximately October of 2008, the Schumachers were without electricity for about a month. On one occasion, defendant got drunk with Michael and hit Kyle with the bat. They heated up the bat in the fireplace. Kyle did not have on a shirt. Defendant burned him on his back with the bat; Carmen burned him just above his "private part." Kelly, Carmen, and defendant burned him more than once with the hot bat.

One day Carmen discovered that Kyle knew how to get out of the zip-ties. Carmen used a metal chain, which Michael had purchased to hang a punching bag, and two padlocks to chain Kyle to a table and forced him to stay on the fireplace hearth. Defendant would come over and see Kyle chained but would not say anything about it.

Kyle slept on the bricks by the fireplace without a sleeping bag or pillow. He was not allowed to shower, but on rare occasions they took him to the backyard to hose off when there was too much blood. He would defecate and urinate on himself. Defendant hit him in the face and made his nose bleed. Kyle coaxed the two year old into bringing him Michael's keys, and he took the key to the padlocks so he would be able to get food. Kyle remembered that one night one of the women choked him, he lost consciousness on the fireplace, and when he awoke his arm was in the fireplace. His skin was "all white

4

and . . . falling off." Defendant and Carmen poured Clorox bleach on the wound, and put butter and salt on it.

Another night got even worse. He had been hit with the bat a lot. Defendant retrieved a knife from the kitchen, and while Carmen, and possibly Kelly, held Kyle down, defendant sliced his arm in a sawing motion. Blood poured onto the table as Kyle screamed and cried. Defendant and Carmen then used their same remedy—pouring bleach into his open wound—and Carmen put butter and salt on it. On other occasions, defendant, Kelly, or Carmen would put candle wax, hot glue, or Super Glue on his open wounds. They poured Kingsford lighter fluid all over him while he sat chained by the fireplace. When the smell got too bad, they would hose him off outside. Of the five separate occasions on which he was doused in lighter fluid, only once did it burn his skin.

Kyle slit holes in the bottom of the couches in which to conceal food wrappers. He also put food in the fireplace. When Carmen discovered the hidden wrappers, she called defendant. Defendant beat him, put lighter fluid on his pants, and lit the pants on fire. It is unclear from the record whether Kyle was chained or zip-tied, but as he tried to put out the fire, they all laughed.

On Thanksgiving, defendant and Carmen took turns pouring Kingsford lighter fluid all over Kyle's head and body, and he sat soaked in lighter fluid for 40 minutes to an hour. They finally hosed him off in the backyard. He was chained during dinner and not allowed to eat.

On November 30 Kyle slept in the garage unchained. Carmen brought him into the house the next morning and chained him to the table. Kyle unlocked his chain to get some food, but Kelly caught him and Carmen called defendant. Defendant had given Carmen a meat cleaver and she used it to slice Kyle's back. Kyle testified that he cried because it hurt so badly. Carmen and Kelly began searching for the key but were unsuccessful.

5

Kyle believed they were going to kill him and decided he needed to escape. While Kelly was watching television and Carmen was upstairs, he unlocked his chain from the table, bolted through the sliding glass door, used the trampoline to jump the fence, and ran into a gym a short distance away. Because he was scared, he lied to the police that he had been kidnapped; he testified to the grand jury that Michael and defendant had threatened to chop him up and throw him into the "Delta River or the aqueduct." It was not until six days later that he told the staff at Shriner's Hospital what really happened.

Kyle insisted that he had not embellished the story. He testified, "[T]here's no need to exaggerate what happened."

*Corroboration*

**Physical Injuries**

Drs. Angela Rosas and David Greenhalgh testified that Kyle's injuries were consistent with the abuse he reported. Although he was 16, he had failed to start puberty because he was undernourished. We will describe the physical injuries from head to foot.

Kyle had a healing abrasion on the side of his right cheek consistent with a heated aluminum bat touching his face He had multiple scars from cuts all over his head consistent with a bat hitting his head. He had a dried, gluelike residue stuck in his short hair.

There was a red line across the side of Kyle's neck that was fairly fresh and consistent with his having been choked.

There were ligature marks on both wrists and healing wounds. He had a very long cut on his upper left arm, as well as cuts and scratches on his upper chest. He had three significant, deep, third-degree burns on his left arm, one above the elbow and two others on his forearm. These burns were open and chronic, and had not healed. They were all the way through the entire skin tissue and exposed the tissue below the skin. Dr. Greenhalgh estimated they were at least a couple of weeks old.

6

The doctors reported healing marks on the upper part of his shoulder but could not determine whether they were burns or abrasions. He had a very deep, severe cut across his back. He had a second-degree burn above his genitals, with some blistering that appeared to be a few days old. He had multiple cuts and abrasions on both legs. And he had a significant cut with a ligature mark around his entire right ankle.

**Kyle's Behavior and Appearance after Escaping**

The assistant manager at the gym testified that a boy who was very dirty and limping "kind of [came] running" into the gym with a chain tied to his ankle, appearing extremely frightened. He begged her, " 'Please hide me, they're coming to get me, hide me.' " She saw a burn mark on his back and a fresh slice in his arm. She also noticed fresh bruises and blood on him.

A responding police officer offered a nearly identical description. The boy was dirty from head to toe, wearing only light cotton shorts with no shirt. He had cuts and bruises all over his body and a chain attached to his right ankle. To her, he seemed very, very frightened and shaky.

Hospital personnel found a key in Kyle's shorts.

**Physical Evidence**

A firefighter removed the chain from Kyle's ankle. A crime scene technician testified the chain weighed 4.6 pounds and was 33 inches in length.

A search was conducted of the Schumacher residence. The house had a stench of rotting food, garbage was strewn everywhere, and the garage overwhelmed the officers with the smell of urine. There was also a strong odor of urine and feces coming from the fireplace. The officers found a baseball bat next to the fireplace. A trampoline was pushed up against the sound wall in the backyard. The officers found candy wrappers in the fireplace and a slit in the bottom of the love seat near the fireplace. They found marijuana in the family room and on a nightstand in an upstairs bedroom, Kingsford

lighter fluid in the laundry room, Clorox bleach in the garage, and a zip-tie in the living room.

Swabs from the bloodstains collected from around the fireplace and from the aluminum bat matched Kyle's DNA profile.

**Witnesses**

Kyle was the only witness who was able to identify defendant as a perpetrator. Nevertheless, there were witnesses who testified that defendant visited the Schumacher residence with some regularity.

A neighbor who lived on the other side of the Schumachers has a son who is approximately the same age as Kyle. The children played together a few times when Kyle first moved in with the Schumachers. This neighbor testified that she saw defendant visiting the Schumachers. She also testified that on a hot summer afternoon she saw Kyle sitting in the yard for five hours. She tried to engage him in conversation, asked him if he was okay, and asked if he wanted to make some money helping her with chores. Kyle self-identified as Roger and refused her offer. Later that day, Kelly came to the neighbor's door and asked her not to talk to Kyle. She appeared angry. The neighbor never observed any injuries on Kyle. She testified that the Schumachers' house was without power for a few days.

Defendant's niece testified she visited the Schumachers with her uncle on three occasions and she met Kyle. She told the jury that Kelly had poured Kyle a cup of alcohol and told him to drink it. She gave him a second cup and he vomited in the entryway. Kelly screamed at him and Carmen cleaned it up.

Defendant's older sister testified that Carmen had visited her on the afternoon of December 1. The sister's husband drove Carmen to a BART station, but she failed to pay the money she promised for the ride. Defendant went to his sister's house to pay her the money that Carmen owed for the ride. He did not tell the investigating officers he had been there when asked.

The jury found defendant guilty as charged of torture, aggravated mayhem, corporal injury to a child, felony child abuse, false imprisonment by violence, criminal threats, and assault with caustic chemicals.  As for the enhancement allegations, the jury found true the allegations he used a baseball bat when he inflicted corporal injury on a child and personally inflicted great bodily injury upon Kyle as to one of the corporal injury counts, and not true the allegations that he inflicted great bodily injury as to two of the other counts.  Defendant was sentenced to concurrent terms of life in prison with the possibility of parole for torture and aggravated mayhem, and a consecutive determinate term of 11 years 8 months for the remaining counts.  We address each of defendant's contentions below.

## DISCUSSION

### I.

### Exclusion of Defense Evidence

The issue at trial was not whether Kyle had been terribly abused, but by whom.  Defendant's sole defense was third party culpability; that is to say, he contends that it was Kyle's three caretakers who had perpetrated the atrocities and that Kyle's account ascribing responsibility to him was uncorroborated.  As he frames it, the issue was identity.  He was the only defendant in the dock, as if he were the surrogate stand-in defendant for the other three.  In a motion in limine, he offered strong evidence to support his theory of the caretakers' guilt—their guilty pleas.  The trial court, however, disallowed the evidence, concluding the guilty pleas were irrelevant and prejudicial to the defense.  We agree with defendant the guilty pleas are probative defense evidence that should have been admitted.  We conclude, however, the exclusion of the evidence was not prejudicial.

"To withstand a challenge under Evidence Code section 352, evidence of a third party's culpability 'need only be capable of raising a reasonable doubt of [the] defendant's guilt.' [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.)  Here the

9

trial court was required to weigh the evidence of the guilty pleas' probative value against the dangers of prejudice, confusion, and the undue consumption of time. "Unless these dangers 'substantially outweigh' probative value, the objection must be overruled." (*Ibid.*)

The trial court seemed to believe that the evidence was not relevant, a position advocated by the Attorney General on appeal. The court remarked, "[O]bviously in this case the D.A.'s theory is that Mr. Waiters in some instances acted through others. She's proceeding on an aiding and abetting theory, obviously. [¶] And so I just don't see how it would ever be admissible. So unless you can come up with something that would be -- would show that somehow it's relevant and actually wouldn't be appropriate to admit, I don't want any reference to that." The Attorney General echoes the same point, arguing that the evidence was "not relevant to prove or disprove a disputed fact of consequence at appellant's trial . . . ."

As defendant points out, the identity of those who perpetrated the crimes is certainly a "fact of consequence" at trial. The fact that Kyle's three caretakers admitted their guilt and were convicted of the charged crimes supports the essence of his defense that they were responsible and is therefore relevant. It is true that the guilty pleas do not exonerate defendant because, as the trial court observed, the prosecution's theory was that defendant was an additional perpetrator, and he aided and abetted their crimes. But exoneration is not the test of relevancy. We concur with defendant that if it was relevant for the prosecution to introduce evidence that Carmen, Kelly, and Michael committed the alleged crimes, it was equally relevant for the defense to introduce evidence that they admitted their guilt by pleading guilty and by accepting convictions for their crimes. The trial court erred by finding the evidence irrelevant pursuant to Evidence Code section 350.

Evidence Code section 352 guides the trial court's exercise of discretion. Relevant evidence should be admitted unless its probative value is substantially

10

outweighed by the probability that its admission will "(a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid*.) " 'Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 684, quoting *People v. Reeder* (1978) 82 Cal.App.3d 654, 553.)

There is scant evidence the trial court weighed each of the factors set forth in Evidence Code section 352. It would have taken but a few moments to take judicial notice of the convictions. Moreover, the defense evidence was consistent with the prosecution's position that the three caretakers committed the charged crimes, and therefore there was no risk of confusing the issues or misleading the jury. On the other hand, the evidence was relevant and significant to the defense position that it was the very three who admitted their guilt who were solely responsible for the crimes.

Rather, the court took on the advocate's role, concluding that the evidence would be harmful to the defense despite the defense assessment that the pleas bolstered its case. Later during the trial, the court denied defendant's attempt to include the pleas in the jury instructions. The court explained: "I just think there is too much danger of a juror thinking that way, that, well -- and I'm not suggesting that this is true, I'm just saying that this is a possibility -- that a juror would say, well, those folks, at least they had the guts to stand up and take responsibility for what they did and be held accountable, and Mr. Waiters didn't, so he should be considered in a negative light because he didn't step forward and take responsibility. That worries me that that sort of thinking might come into play, so I really think that it's better not to mention the fact that there have been guilty pleas." In short, the trial court excluded the defense evidence because it believed it would be prejudicial to the defense. By trumping defendant's tactical decision with its own, understating its relevance, and failing to conduct a thorough Evidence Code

11

section 352 analysis, the court denigrated defendant's right to present all relevant evidence of significant probative value.

The Attorney General cites to CALCRIM No. 373, an instruction the court gave to the jury as follows: "The evidence shows that other persons may have been involved in the commission of the crime[s] charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about, nor draw any inferences from whether those other persons have been or will be prosecuted or convicted. Your duty is to decide whether the defendant on trial here committed the crime[s] charged." In the Attorney General's view, CALCRIM No. 373 supports the exclusion of the guilty pleas.

Not so. Defendant was not asking the jurors to speculate about the other perpetrators; indeed, he asked just the opposite for he proffered evidence that would end any speculation. He hoped to introduce the very evidence that would validate his theory that Kyle's caretakers were guilty of the criminal course of conduct they inflicted on him for the months they held him captive. Cases involving the speculative involvement of codefendants and those involving third party culpability evidence prejudicial to the defendant are inapposite. (See, e.g., *People v. Cummings* (1993) 4 Cal.4th 1233, 1322.)

Nevertheless, defendant vastly overstates the likely impact of the exclusion of the defense evidence. We reject his argument that uninformed about whether or how the other three were punished, the jury was more inclined to convict him as a stand-in for them all and to provide a sense of justice to their victim. As just mentioned, the jury was instructed not to speculate about whether the others had been prosecuted and to focus exclusively on whether defendant committed the charged crimes. (CALCRIM No. 373.) We must assume the jurors upheld their oath to follow the law. (*People v. Estrada* (2006) 141 Cal.App.4th 408, 414, fn. 4.) While the instruction does not support exclusion of the guilty pleas, it dispels the notion that the jury convicted defendant as a stand-in.

12

More important than the hypothetical question whether the jurors would punish defendant for the sins of his friends is the abundance of evidence that incriminated them quite apart from their own guilty pleas. Kyle testified at length about each caretaker's role in beating, burning, starving, and torturing him. He ascribed minimal responsibility to Michael while identifying Carmen as the central figure in the ongoing abuse. Carmen, according to Kyle, was ably assisted by Kelly. The prosecution extracted a horror story from Kyle about what he endured during the many months he was zip-tied and then chained, and how all three caretakers participated to varying degrees and at different times. There was no dispute at trial that the caretakers had committed a laundry list of unspeakable crimes. The physical evidence left no room for doubt and corroborated Kyle's testimony. The investigating police officers described a terrible stench of urine and feces when they entered the Schumacher residence. And they confiscated many of the tools and chemicals used to torture Kyle, including the bat with blood on it, the bleach, and the lighter fluid. They found marijuana throughout the house and blood near the fireplace. In addition, Kelly lied to the officers and Carmen absconded. In short, the jury was well-informed that Carmen, Michael, and Kelly had committed atrocious crimes against Kyle. Because so much of the focus of the trial was on how, where, and when the three caretakers inflicted such grueling punishment on their young charge, we conclude the introduction of the guilty pleas would have only confirmed what the jury already knew. We find the guilty pleas were duplicative of the mountain of evidence that pointed to their culpability, and thus their impact on the jury would have been de minimis. Any error in excluding the evidence therefore was harmless beyond a reasonable doubt.

## II.

### Instructional Error

#### A. *Motive*

The court instructed the jury on the intent necessary for the crime of torture as follows: "When inflicting the injury, the defendant intended to cause cruel or extreme

13

pain and suffering for the purpose of revenge, persuasion, or for any sadistic purpose." (CALCRIM No. 810, as modified.) Defendant contends that the prosecution's burden of proving the requisite intent for torture was impermissibly diluted by an unrelated instruction informing the jury that motive is not an element of the crime. (CALCRIM No. 370.) This same argument was rejected by the California Supreme Court most recently in *People v. Whisenhunt* (2008) 44 Cal.4th 174 (*Whisenhunt*) and by our court in *People v. Hamlin* (2009) 170 Cal.App.4th 1412 (*Hamlin*).

Defendant argues that a juror might reasonably equate the meaning of motive with the meaning of purpose. If so, the instruction stating that motive is not an element of the crime would have the effect of negating the element of sadistic purpose required for torture. As demonstrated in *Whisenhunt* and *Hamlin*, the essential flaw in defendant's argument is conflating the meaning of intent with motive. The Supreme Court explained: "As we have noted in rejecting another similar challenge to [CALCRIM No. 370], 'although malice and certain intents and purposes are elements of the crimes, . . . *motive* is not an element.' (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503-504 . . . .) 'Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice.' (*Id.* at p. 504.)" (*Whisenhunt*, *supra*, 44 Cal.4th at p. 218.)

In *Hamlin*, we elaborated on the differentiation between motive and purpose. The fact that a crime requires the intent to achieve a particular purpose does not elevate motive to the status of an element of the crime. We wrote, "[M]otive is not an element of the crime of murder by torture, even though one of the essential elements of that crime is that the prohibited act be committed with the intent to cause pain for a specific purpose." (*Hamlin*, *supra*, 170 Cal.App.4th at p. 1453.)

Defendant recognizes that *Hamlin* rejected a similar challenge in a torture case, but he attempts, without success, to distinguish the holding based on the change in the jury instruction on motive. In *Hamlin*, CALJIC No. 2.51 provided: " 'Motive is not an

14

element of the crime charged and need not be shown.' " (*Hamlin*, *supra*, 170 Cal.App.4th at p. 1451.) By contrast, the jury in the case before us was instructed, "The People are not required to prove that the defendant had a motive . . . ." (CALCRIM No. 370.) He contends that CALCRIM No. 370 implies that proof of motive is never required for any reason when, in fact, proof of torture requires proof of purpose and purpose is the same as motive. But defendant's reasoning is circular and depends on the same erroneous premise—that motive is synonymous with purpose.

Although the facts do not involve torture, *People v. Hernandez* (1988) 46 Cal.3d 194 (*Hernandez*) provides additional clarity on the distinction between motive and "penal statutes [that] describe a specific mens rea by defining certain prohibited conduct done 'for the purpose of' achieving some further end." (*Id*. at p. 201.) The court stated simply, "Where a statute specifically requires that an act or offense be done 'for the purpose of' achieving a further goal, we are no longer dealing with mere motive, a useful but optional aspect of the crime. We are dealing with a required, specific mental state." (*Id*. at p. 202.)

Defendant extrapolates the logic of *Hernandez* to suggest that torture requires proof of motive as well as specific intent. But that is not what *Hernandez* held. The court in *Hernandez* refined the meaning of specific intent in those cases in which the Legislature has determined that the prohibited conduct must be done to achieve a particular purpose. The court did not equate motive with purpose or suggest that, contrary to the general rule, the prosecution must prove motive.

It is true that in *People v. Maurer* (1995) 32 Cal.App.4th 1121 (*Maurer*) we reversed a conviction for misdemeanor child annoyance because the jury was given explicitly conflicting instructions. On the one hand, the court instructed the jury that misdemeanor child annoyance required proof the defendant was " 'motivated by an unnatural or abnormal sexual interest' " (*id*. at p. 1125), and on the other hand, it was told that motive was not an element of the crime (*id*. at p. 1126). "[T]he question," we

15

observed, "whether 'motive' is somehow different from 'motivation' or 'motivated by' is a question of some academic interest but of little practical significance. . . . We must bear in mind that the audience for these instructions is not a room of law professors deciphering legal abstractions, but a room of lay jurors reading conflicting terms." (*Id*. at p. 1127.) We reversed for instructional error.

Our focus in *Maurer* on how a reasonable juror would be confused by overtly conflicting instructions goes to the heart of the question. In considering a claim of instructional error we must ask whether it is reasonably likely the jurors would have construed the instructions in a manner that would have diluted the prosecution's burden of proof, negated an element of the crime, or otherwise misstated the law. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214.) Here we conclude there is no reasonable likelihood the jurors misunderstood the instruction on torture because they had also been told the prosecution did not need to prove motive.

We need not reiterate the lessons taught in *Whisenhunt*, *Hamlin*, and *Hernandez* other than to state the obvious that motive is not synonymous with intent. *Whisenhunt* and *Hamlin* remind us that torture requires a specific mens rea, including the specific intent to achieve a particular objective. That objective or "purpose" does not explain why a defendant wants or needs to inflict extreme pain on his victim other than to satisfy some vague sadistic purpose. It is not likely a juror would ignore an instruction requiring a jury finding that the defendant acted for a sadistic purpose based on the mere admonition that the prosecution did not have to prove motive. Neither the law nor a reasonable assessment of the impact on a jury supports defendant's claim that the court erred by giving the motive instruction.

## B.      *Failure to Instruct on Lesser Included Offenses*

Defendant asserts the trial court committed reversible error by failing to give six instructions sua sponte on lesser included offenses. He correctly points out the distinction between appellate review of a challenge to the sufficiency of the evidence and

16

appellate review of whether the evidence is substantial enough to trigger a trial court's sua sponte obligation to instruct.  Whereas we must review the whole record in the light most favorable to the jury's verdicts in determining whether there is sufficient evidence to support the judgment (*People v. Cravens* (2012) 53 Cal.4th 500, 507), we must view the evidence in the "light most favorable to the defendant" and resolve all doubts in favor of the accused in determining whether the trial court erred by failing to instruct sua sponte on a lesser included offense (*People v. Barnett* (1998) 17 Cal.4th 1044, 1151; see *People v. Wilson* (1967) 66 Cal.2d 749, 763).  The trial court must instruct on a lesser included offense if there is substantial evidence that the defendant is guilty only of the lesser and not the greater offense.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1184 (*Carter*); *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)

As to the first three of the omitted instructions, defendant also argues that the evidence is insufficient to support the conviction of the greater offense.  As to those crimes, we will consider both challenges under one heading, analyzing whether the evidence was substantial enough to trigger the trial court's sua sponte duty to instruct on the lesser included offense and whether the evidence was substantial enough to support the conviction of the greater offense.

### 1.     Aggravated Mayhem/Battery with Serious Bodily Injury

Defendant was charged with two counts of aggravated mayhem, and the jury was instructed on both aggravated and simple mayhem.  Penal Code section 205 defines aggravated mayhem as follows:  "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body."  Simple mayhem is defined by Penal Code section 203, which provides:  "Every person who unlawfully and maliciously deprives a human being

17

of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

Rejecting the simple mayhem option, the jury found defendant guilty of both counts of aggravated mayhem. He argues the jury might have convicted him of battery with serious injury had the court instructed on the lesser included offense because the evidence he intended to permanently disfigure Kyle, or that Kyle was in fact permanently disfigured, was "borderline."

There is no dispute that battery with serious injury is a lesser included offense of aggravated mayhem. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1168.) The question is whether the evidence viewed in the light most favorable to defendant is substantial enough for a jury to convict him of battery and not aggravated mayhem, either because Kyle did not suffer a permanent disfigurement or defendant did not intend to permanently disfigure him.

Defendant contrasts the scars on Kyle's back and arm with bigger, more visible scars on the face or a woman's breast, suggesting that his were benign by those standards. He emphasizes that the burn marks on his back were described merely as "pink circular" marks, and one doctor could not tell whether they were burn marks or abrasions. The scar on his arm was small and much unlike the type of atrocious disfigurement featured prominently in the mayhem cases.

As with other issues raised by defendant, the argument is enticing when examined at close range and removed from the context in which it arises. The challenge in resolving this issue and others is to keep in mind the broader context in which they are raised and the evidence of the facts and circumstances occurring over many, many months in the Schumacher house.

During closing argument the prosecutor told the jury that count two involved the incident when defendant burned Kyle's back with an aluminum bat that had been heated in the fireplace, and count four involved the episode when defendant sliced Kyle's arm

18

with a sawing motion with a kitchen knife. Doctors testified that both injuries produced permanent scarring on Kyle's back and arm, respectively. Defendant denigrates the seriousness of the injuries, insisting that neither the scarring on Kyle's back from the bat nor the one-and-one-half- to two-inch scar on his arm qualify as the type of serious permanent disfigurement necessary for mayhem. Both incidents, he continues, were more in the nature of the type of "indiscriminate attack" that did not constitute mayhem in *People v. Anderson* (1965) 63 Cal.2d 351, 359. In other words, there was insufficient evidence that the injuries resulted in permanent disfigurement and that he intended to permanently disfigure Kyle.

Defendant reminds us that "not every visible scarring wound can be said to constitute the felony crime of mayhem" (*Goodman v. Superior Court* (1978) 84 Cal.App.3d 621, 625) and a cut that heals "without serious scarring [is] not mayhem" (*id*. at p. 624). In *Goodman*, the defendant slashed the victim's face with a knife and she, like Kyle, had a permanent scar. While the court acknowledged that not every visible scar means felony mayhem, it refused to hold as a matter of law that a trier of fact could not reasonably conclude that mayhem had been committed. (*Id*. at p. 625.)

As for the count involving the knife wound, we summarily reject defendant's challenge to the sufficiency of the evidence. The jury heard the savage account of how defendant retrieved a knife from the kitchen and sawed Kyle's arm while Carmen, and maybe Kelly, restrained him. That account certainly constituted substantial evidence that he intended to slice and disfigure him. This, the jury could conclude, was not a wild or random attack but a deliberate infliction of a maiming injury following months of beatings and other cruel punishments. There is not substantial evidence the crime constituted only battery with serious injury and not aggravated mayhem. The scarring confirmed that the injury was both serious and permanent. The court therefore had no sua sponte duty to instruct on the misdemeanor charge.

19

The count involving the burns to Kyle's back presents a somewhat closer question only because the scars themselves were harder to detect. But defendant would have us upset a jury verdict convicting him of aggravated mayhem for putting an aluminum bat heated in a fireplace directly on Kyle's bare back based on the lucky fact the burns healed better than what might have been expected. This we cannot do for two reasons: 1) the act of placing a heated bat directly on bare skin constitutes substantial circumstantial evidence defendant intended to inflict a permanent disfigurement, and 2) while the scar may not have been grotesque, there was substantial evidence it is permanent. Thus, viewing the evidence in the light most favorable to the prosecution, we must conclude there is more than ample evidence of aggravated mayhem.

Nor do we conclude the trial court was obligated to instruct on battery even though we must review the evidence in the light most favorable to the defense. The circumstances under which Kyle was scorched simply do not allow an inference that defendant intended to inflict a serious injury but not to permanently disfigure Kyle, or that the scars do not constitute a permanent disfigurement. Defendant's argument is divorced from the reality of what he did. He finds a minuscule gap in the evidence such as whether he or Carmen or Kelly actually placed the bat in the fire to heat it up, as if it mattered, when Kyle testified plainly that it was defendant who seared his back while the women held him down. And, of course, the burning incident followed months of brutal beatings with the bat. We cannot accept defendant's argument that a jury might have concluded under these circumstances that when defendant held a heated aluminum bat on the back of a boy he routinely beat, watched others beat, and who was restrained, he did not intend to permanently disfigure him. Nor when both doctors testified the scars were visible and permanent do we conclude the judge erred in failing to give the jury the option to find battery instead of mayhem.

## 2. Felony/Misdemeanor Child Abuse

Defendant contends the trial court had a sua sponte duty to instruct on misdemeanor child endangerment in violation of Penal Code section 273a, subdivision (b) as a lesser included offense of felony child endangerment in violation of section 273a, subdivision (a). The difference between the two crimes is whether the circumstances or conditions were likely to produce great bodily injury or death. (*People v. Moussabeck* (2007) 157 Cal.App.4th 975, 980.) The phrase " 'likely to produce great bodily harm or death' " means " ' "the probability of serious injury is great." ' [Citation.]" (*People v. Chaffin* (2009) 173 Cal.App.4th 1348, 1352.) Defendant argues that pouring bleach, "a well-know[n] germicide and disinfectant," on the open gash in Kyle's arm, after he sliced it with a knife, was not under conditions that were *likely* to produce great bodily injury. We disagree.

To be fair, defendant's argument is in the context of his claim that the court should have instructed on the lesser included offense, asserting that there was a possibility the jurors might find pouring bleach on the wound was not likely to produce great bodily injury. We have no difficulty dismissing his tangentially related argument that there is insufficient evidence to support the jury's conviction of felony child endangerment, based as it is on only a selective parsing of the record.

The prosecutor framed the argument on felony child endangerment as follows: "Count 9 is child abuse or endangerment likely to cause great bodily injury or death. This crime is not unlike the torture crime that I'll talk about later. It [c]an be a continuing course of conduct, it can just occur repeatedly. In this instance, though, these are the elements, you have to -- the defendant has to willfully cause or permit the child to suffer unjustifiable physical pain or mental suffering under circumstances likely to produce great bodily harm or death.

"Well, in this particular case the definitions of this charge are similar to what you have heard before, willfully, on purpose, it has to be done on purpose, not an accident.

Unjustifiable physical pain or mental suffering, again, not reasonably necessary or excessive under the circumstances. In this case, how do you cause or permit unjustifiable physical pain or mental suffering? After the aggravated mayhem has occurred, that's the infliction of the knife wound, Anthony Waiters, along with Carmen Ramirez, poured bleach on the wound.

"I don't know if that's something Anthony learned during his CPR training that we heard about that he said he had taken, but Dr. Rosas said that would cause more infection and more pain, and the purpose was unjustifiable pain, because Kyle told you that Mr. Waiters knew it would burn and knew it would hurt. We've just pulled out that one instance of conduct for that charge, that's Count 9. They got no stitches, they just put tape on it."

Kyle testified to two incidents when defendant, with the help of Carmen or Kelly or both, poured bleach into his open wounds—once on his scorched elbow and once into the laceration on his arm. Although felony child endangerment can be a continuing course of conduct crime, the prosecutor highlighted the incident during which defendant poured bleach into Kyle's open wound on his arm where defendant had sliced it. The doctor's testimony, however, referred to both incidents in describing the likely consequences of pouring bleach into burns and cuts.

While it is true that Dr. Rosas testified that bleach was not caustic enough to cause second-degree burns unless Kyle's skin was extra sensitive and there is no direct evidence the bleach exacerbated the injuries, defendant ignores the testimony of Dr. Greenhalgh, the burn expert from Shriner's Hospital, that Clorox was a toxic agent that would probably injure the tissues and could cause a chemical burn if left on the skin for 10 to 20 minutes, and Kyle's testimony attesting to how badly the bleach burned. Moreover, the prosecutor reminded the jury that Dr. Rosas testified that pouring bleach into the laceration "would cause more infection and more pain." Defendant dismisses Dr. Rosas' testimony, however, relying on Dr. Greenhalgh's statement that the bleach

22

could cause injury, which in defendant's view does not meet the "probability" standard to render the injury likely. We certainly cannot say evidence by medical professionals that pouring bleach on an open wound would be painful, can cause infection, and can be toxic, coupled with the victim's testimony that it burned and was painful, was insufficient to support a jury finding that pouring the bleach into such severe open wounds was likely to produce great bodily injury.

The more difficult question is whether the evidence, viewed in the light most favorable to defendant, triggered a sua sponte obligation to instruct on misdemeanor child endangerment; the easier question is whether, in any event, it is reasonably probable the jury would have convicted defendant of misdemeanor endangerment rather than the charged offense of felony endangerment if it had been instructed as defendant now urges on appeal.

We opt for the easier question because it is dispositive. Rather than splitting hairs over whether the evidence, when viewed liberally in favor of defendant, might have provided the jury with a theoretical option to convict him of a misdemeanor, we conclude it is not reasonably probable the jury would have convicted him of the lesser charge. We mine the entire record to evaluate the probability the jury might have found it was unlikely that pouring bleach into Kyle's wounds would cause great bodily injury.

First, of course, is the nature of the wound identified by the prosecutor and the circumstances under which it was inflicted. Defendant began beating Kyle in July of 2008. Over a course of months he observed Carmen and Kelly also beating, zip-tying, and finally chaining Kyle. By the time Kyle suffered third-degree burns on his elbow from the fireplace where he was forced to sleep and remained restrained and defendant sliced his arm with the kitchen knife, defendant had been an active participant in the child's torture for five or six months.

The wound itself was ghastly. Kyle described blood pouring out of the laceration defendant inflicted by sawing his arm with a knife. Despite the serious nature of the

23

wound, defendant insists the jury might have concluded that pouring bleach into it was not likely to exacerbate the injury any further. Defendant acknowledges that felony endangerment does not require the actual infliction of great bodily injury (*People v. Valdez* (2002) 27 Cal.4th 778, 784), but only the likelihood that it might result. Thus the crucial inquiry is timing; that is to say, at the time defendant participated in pouring bleach into an open laceration, was it likely to produce great bodily injury?

Given the gravity of the circumstances under which the bleach was used, the seriousness of the wound, and the alternatives defendant and the others might have used to treat or get treatment for the wounds, we agree with the Attorney General there is no reasonable likelihood the jury would have convicted defendant of misdemeanor rather than felony endangerment. The failure to instruct sua sponte on the lesser included offense was harmless given a record replete with an escalating pattern of inflicting egregious pain and suffering on Kyle. It simply is not reasonably probable the jury would have concluded that in the midst of this ongoing torture, defendant sought to cleanse the wound in an effort to promote healing when but a few seconds earlier he was slicing Kyle's arm.

### 3. Felony/Misdemeanor False Imprisonment

Defendant again makes the two-pronged argument that there was insufficient evidence to support the jury conviction on the greater offense of felony false imprisonment and ample evidence to trigger the trial court's sua sponte obligation to instruct on the lesser included offense of misdemeanor false imprisonment. Here defendant asks even more of us—to suspend our familiarity with defendant's role in the household for at least six months and to consider the abstract possibility that his involvement in Kyle's captivity was without violence, menace, fraud, or deceit. Both the challenge to the sufficiency of the evidence to support the conviction for felony false imprisonment and to the trial court's failure to instruct on the lesser included offense of misdemeanor false imprisonment are without merit.

24

In this, as in many of the arguments he raises on appeal, defendant balks at the notion that he is responsible for the cruelty of his neighbors and Kyle's caretakers. He insists he had no duty to intercede on Kyle's behalf and he should not be held vicariously liable, in this particular instance, for chaining him to the table by the fireplace in the absence of evidence that he participated in the chaining. But the prosecution's theory was not one of vicarious liability predicated on the failure or duty to act, but on the abundance of evidence that defendant knowingly and effectively aided and abetted the crimes committed next door.

In attempting to distance himself from the moment when Kyle was first chained, defendant seems to forget that he was the one who supplied the bat they all used to beat Kyle, he was the one who poured lighter fluid on him and lit him on fire, he was the one who sawed his arm with the knife, and he was the one who gave Carmen the meat cleaver. Yet he argues that those crimes are separate and apart from the false imprisonment. He would have us ignore all the violence, both that which he perpetrated and that which he aided and abetted, in order to conclude there was insufficient evidence of felony false imprisonment and sufficient evidence that he was guilty only of misdemeanor false imprisonment. We reject his clever, but ineffectual, attempt to separate the act of chaining from the context in which Kyle was restrained and thereby to inoculate him from the violence.

There is ample evidence to support the prosecution's theory that defendant aided and abetted Carmen and Kelly in keeping Kyle a chained captive and that his captivity was by means of violence. To suggest, as defendant does, that no more violence was used than necessary to chain this boy is to ignore volumes of testimony, including the damning account of how defendant sawed his arm with a knife while he was chained. It was the jury's prerogative, not ours, to draw the logical and imminently reasonable inference that by observing Kyle's treatment, supplying the weapons, and participating in the beating, burning, and torturing, defendant knew that the others were falsely

25

imprisoning him and he intended to aid and assist his restraint. The jury could have, but did not, accept defendant's argument that by asking Carmen and Kelly why Kyle was being restrained he had not participated in the decision to restrain him. And it offends any notion of civilized conduct to suggest that the type of protracted and cruel conduct Kyle endured "could have been a lawful act of discipline" by a "parental authority" he should not have "second-guessed." The court had no sua sponte obligation to instruct on misdemeanor false imprisonment as there was simply no credible evidence to suggest that defendant participated only in a nonviolent restraint of Kyle.

### 4.    **Assault with a Caustic Chemical/Simple Battery**

Defendant was charged and convicted in count twelve of violating Penal Code section 244, which provides: "Any person who willfully and maliciously places or throws, or causes to be placed or thrown, upon the person of another, any vitriol, corrosive acid, flammable substance, or caustic chemical of any nature, with the intent to injure the flesh or disfigure the body of that person, is punishable by imprisonment in the state prison for two, three or four years." As used in section 244, flammable substance means gasoline, petroleum products, or flammable liquids with a flashpoint of 150 degrees Fahrenheit or less.

As the Attorney General argues, Kyle testified to at least two different incidents during which defendant threw lighter fluid on him. On the night before Thanksgiving 2008, defendant beat him, threw lighter fluid on him, and then lit his pants on fire while he and the others laughed, watching Kyle attempting to put out the fire. However, in her closing argument the prosecutor relied on the second incident, which occurred on Thanksgiving Day when defendant threw lighter fluid all over Kyle's body and would not allow him to wash it off for at least 40 minutes. The fluid burned his lower abdomen.

Holding the prosecutor to an election of the Thanksgiving Day lighter fluid incident, defendant contends the trial court had a duty to instruct on the lesser included offense of simple battery. (Pen. Code, § 242.) He argues that because Carmen and Kelly

26

had doused Kyle in lighter fluid on previous occasions and he did not appear to have suffered serious injury, the evidence left room for doubt whether he had the specific intent to " 'injure the flesh or disfigure the body.' " And despite the fact that Kyle did suffer a second-degree burn on his lower abdomen following the Thanksgiving incident, he maintains that "the issue at hand does not involve the injury that was actually suffered, but whether the infliction of such injury was intended."

Once again, defendant would have us lose sight of context and common sense. He would have us forget that the night before Thanksgiving he had used the lighter fluid to set Kyle on fire, and the following day he again poured it all over the boy and made him soak in it until Kelly could no longer stand the smell. He would have us ignore the fact that soaking in lighter fluid has the potential to burn the skin, whether it results in a second-degree burn or not, and of course in this case it did exactly that. Thus, we conclude there is not substantial evidence that defendant was guilty of the lesser offense, simple battery, rather than the greater offense of assault with a caustic chemical. His ongoing participation in the brutal treatment of his vulnerable neighbor evidenced a culpable mens rea commensurate with felony assault, and the court was not obligated to instruct on the sheer fantasy that maybe he only inflicted a simple battery.

### 5.   Corporal Injury on a Child/Misdemeanor Battery

Continuing in the same vein, defendant asserts that if we view the evidence in the light most favorable to him, the jury might have concluded that hitting Kyle with a bat and punching him hard enough with a boxing glove to cause his head to hit the fireplace did not cause a wound or external or internal injury, whether of a serious or minor nature. In other words, the jury should have been instructed not only on the greater offense of corporal injury on a child, but on the lesser included offense of misdemeanor battery, because Kyle did not necessarily suffer a "traumatic condition" as that term is defined by Penal Code section 273.5, subdivision (c).

27

It is important to remember that despite a lay understanding of the word "traumatic" suggesting a grievous or significant injury, the traumatic condition described in Penal Code section 273.5 does not need to be serious. A minor injury suffices. A " 'traumatic condition' " is a " 'wound or external or internal injury, whether of a minor or serious nature, caused by a physical force.' " (*People v. Gutierrez* (1985) 171 Cal.App.3d 944, 951, fn. 6; see CALCRIM No. 822.) Defendant points out the jury found he did not inflict great bodily injury as it relates to counts seven and eight involving corporal injury to a child.

According to Kyle, defendant directly applied physical force by hitting him with a bat and a boxing glove. Kyle's blood was found on the bat, and he testified the beatings hurt really badly and he could not use a body part. His head injuries were consistent with having been beaten with a bat. Similarly, Kyle testified defendant hit him with a boxing glove, causing him to cut his head on the fireplace.

Defendant poses a number of far-fetched hypotheticals. The blood on the bat came from Carmen's, not defendant's, pummeling. The jury rejected Kyle's testimony as an exaggeration because if, as Kyle asserted, defendant had hit him with full force with a bat, he would have sustained great bodily injury, which the jury found he did not. And finally, Kyle's vague description of his inability to use his body part is akin to mere "soreness and tenderness" that does not amount to a "traumatic condition." (*People v. Abrego* (1993) 21 Cal.App.4th 133, 138.)

We disagree. There is no reasonable reading of this evidentiary record to support a finding that defendant's exertion of physical force on both occasions did not result in a traumatic condition of Kyle's body under the statute. The evidence was overwhelming that in each case he did inflict injury, even if the injury was not severe enough to constitute great bodily injury. Because there is not substantial evidence to support a conviction for misdemeanor battery and not corporal injury to a child, the trial court had

28

no duty to instruct on the lesser included offense.  (*Carter*, *supra*, 36 Cal.4th at p. 1184; *Breverman*, *supra*, 19 Cal.4th at p. 162.)

### 6.       Criminal Threats/Misdemeanor Child Abuse

According to the Attorney General, defendant's sixth and final complaint about the court's failure to instruct on lesser included offenses suffers from a different defect. Whereas the other challenges pertain exclusively to the quantum of evidence available to support the greater offense, the Attorney General argues that defendant's contention the trial court should have instructed on misdemeanor child abuse compels us to ask the preliminary question whether misdemeanor child abuse is a lesser included offense of criminal threats based on the associated allegations made in this case.  Defendant readily admits that in comparing the elements of each offense, misdemeanor child abuse is not a lesser included offense of criminal threats.  We need not address this issue because defendant's argument fails for the same evidentiary reason his five other contentions have failed—there is not substantial evidence he was guilty only of the lesser offense.  His argument is plagued with the same mischief as the others in asking us to not only consider the evidence in the light most favorable to him but to ignore the entire context in which he acted and which the jury considered to evaluate his guilt.

Here he suggests "there is a reasonable 'chance' that the jury could have found that [defendant], while in a state of inebriation, was making bad jokes to make women laugh, without realizing that his comments would cause Kyle genuine mental suffering, and without specifically intending the same, and that he was guilty only of misdemeanor child abuse."  In other words, he contends there was substantial evidence he did not specifically intend to threaten Kyle, nor did his comments have the effect of making Kyle feel threatened.  Let us examine the context of how, when, and where he threatened Kyle.

The criminal threats charge was predicated on the several times that defendant and Michael Schumacher told Kyle they would cut him up and throw him in the river or aqueduct.  Taken alone, the threat might have seemed preposterous.  But by the time

defendant made these threats on multiple occasions, Kyle had been isolated, starved, confined, and routinely beaten.  It is unreasonable to suggest that under these circumstances defendant might not have realized that threats to kill the boy would be taken seriously.  To the contrary, Kyle remained so traumatized after his escape that he lied to the authorities about being abducted and did not identify his captors for nearly a week.  We reject defendant's attempt on appeal to recast the threats as harmless banter by drunken neighbors designed merely to make Carmen and Kelly laugh when together they were involved in a cruel, criminal enterprise to persecute this young teen.  There is no substantial evidence, when reviewed in light of the whole record, that defendant is guilty only of the lesser and not the greater offense, and therefore there was no sua sponte obligation to instruct on misdemeanor child abuse.

### 7.     <u>Voluntary Intoxication/Ineffective Assistance of Counsel</u>

Presumably because the law is clear that the trial court has no obligation to instruct on voluntary intoxication in the absence of a defense request for the pinpoint instruction (*People v. Clark* (1993) 5 Cal.4th 950, 1022, disapproved on an unrelated point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22), defendant contends his lawyer was ineffective for failing to request an instruction explaining that intoxication might have inhibited his ability to formulate the specific intent necessary to commit many of the charged offenses (*People v. Pearson* (2012) 53 Cal.4th 306, 325).  Defendant predicates his argument on Kyle's testimony he either had been drinking or was drunk several of the nights he was alleged to have beaten, burned, or threatened Kyle.  Defendant bears the burden of proving his lawyer's performance was constitutionally inadequate and his deficiencies were prejudicial.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 693-694 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.).  He falls woefully short of meeting his burden.

"[I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an

explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015; see *People v. Ochoa* (1998) 19 Cal.4th 353, 434.) "[C]ounsel does not render ineffective assistance by choosing one or several theories of defense over another. [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1007 (*Cunningham*).) As long as trial counsel could have had *some* satisfactory explanation for the conduct complained of, a claim of ineffective assistance must be rejected on direct appeal. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

At trial, defendant did not raise the defense of voluntary intoxication. There is nothing in the record to suggest defense counsel was asked for an explanation as to why he adopted this trial strategy. In choosing third party culpability to the exclusion of the exceedingly weak, if not totally incredible, defense that he was too drunk to specifically intend to torture, maim, or injure Kyle, counsel was employing an imminently reasonable trial tactic. He simply elected to pursue the strongest defense he had and to reject the much flimsier, indeed inculpatory, fallback position that he was too drunk to form the mens rea necessary to commit each of the charged offenses over a six-month period.

The evidence that defendant was drunk was vague. Although we reject the Attorney General's implication that Kyle needed to demonstrate some kind of expertise in recognizing the symptoms of intoxication, he simply did not testify how much alcohol defendant had actually consumed, over what period he had consumed it, or just how drunk he was during the episodes Kyle described he had been drinking. Scant evidence that a defendant has consumed alcohol does not necessitate an instruction on voluntary intoxication.

The principles of law involved here are straightforward. "Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act." (Pen.

31

Code, § 29.4, subd. (a) [formerly Pen. Code, § 22, renumbered by Stats. 2012, ch. 162, § 119].) "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Pen. Code, § 29.4, subd. (b).) However, "[a] defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 635, 677 (*Williams*).)

In *Williams*, the defendant requested an instruction on voluntary intoxication as a defense to homicide based solely on a witness's testimony that the defendant was " 'probably spaced out' on the morning of the killings." (*Williams*, *supra*, 16 Cal.4th at p. 677.) The trial court refused to give the requested instruction. (*Ibid*.) On review, the defendant contended the trial court erred in refusing to give the instruction, and he sought "to bolster that argument by pointing to comments he had made in the recorded interview with police that around the time of the killings he was 'doped up' and 'smokin' pretty tough then.' " (*Ibid*.) The Supreme Court rejected the defendant's argument, stating as follows: "Even if we consider all three of these statements, there was no error. Assuming this scant evidence of defendant's voluntary intoxication would qualify as 'substantial,' there was no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent." (*Id*. at pp. 677-678.)

The same conclusion applies here. As in *Williams*, the evidence of intoxication here was scant. Just as in *Williams*, there was no evidence at all that defendant's voluntary intoxication had any effect on his ability to formulate intent. As a result, defense counsel might have drawn the reasonable conclusion that a request for an instruction on voluntary intoxication would have been fruitless. Or, he might have decided to rely exclusively on third party culpability as his sole defense.

32

We will not second-guess trial counsel's tactical decision to forego such a weak defense, particularly in light of the fact that, according to Kyle, defendant visited the house and participated in the abuse several times a week for nearly six months. There certainly was no evidence that he was drunk each and every time he came over to the house and aided and abetted the charged offenses. Thus, defense counsel may have made the reasonable decision to minimize the drinking issue by ignoring it. The choice to present the innocence defense over the intoxication defense is not a decision that creates ineffective assistance of counsel. (*Cunningham*, *supra*, 25 Cal.4th at p. 1007.) Accordingly, we conclude trial counsel did not render ineffective assistance.

## 8.    **Parental Right to Discipline**

Defendant next contends the trial court had a sua sponte obligation to instruct the jury on a parent's right to discipline a child as a defense to felony false imprisonment (count ten) and two counts of corporal injury to a child (counts seven and eight) despite the fact that he, a mere neighbor, was not a parent, guardian, or other person legally permitted to discipline the child. He argues vehemently in other contexts that he had no duty to care for or protect Kyle, and therefore he cannot be held criminally liable for his failure to act to stop the torture and mayhem. Yet he insists the court should have given CALCRIM No. 3405, presumably because as a friend of the boy's de facto guardian, he should have been entitled to help her discipline him. More specifically, if defendant believed that Kyle was being restrained by Carmen in the exercise of lawful parental discipline, he would lack the criminal intent necessary to make him criminally liable on an aiding and abetting theory. We need not address the preposterous notion that the type of discipline he inflicted was justifiable because there is no authority for the proposition that someone as tangentially related to a child as defendant has any authority to exert physical force to discipline him.

Defendant's lopsided recitation of the facts bears no resemblance to the story Kyle told and the jury was free to accept. He recited incident after incident during which

33

defendant not only saw him bound in restraints but took full advantage of it.  We cannot accept the notion he believed Carmen was acting within the scope of her lawful parental authority and he was merely deferring to it.  Because there are no facts or law to support defendant's argument, the trial court had no obligation to instruct the jury in the language of CALCRIM No. 3405.  (*People v. Checketts* (1999) 71 Cal.App.4th 1190, 1194-1195.)

## III.

## Criminal Threats and the First Amendment

Citing cases in which a poet and a painter were prosecuted for making criminal threats through their art, defendant insists there is no clear and convincing evidence that his threats to kill Kyle were "true threats."  (*In re George T.* (2004) 33 Cal.4th 620, 631-632; *In re Ryan D.* (2002) 100 Cal.App.4th 854, 861.)  He urges us to independently review the evidence to insure his right to free speech under the First Amendment is adequately protected.  He readily accepts the fundamental principle that "true threats" are unprotected, but he maintains he need only raise a "plausible" claim that the speech was constitutionally protected, and in his view, it was entirely plausible that he was just joking around when he threatened to kill Kyle.

Defendant's characterization of plausibility is completely implausible. Nevertheless, we will not quibble over the appropriate standard of review because even if we accept defendant's invitation to independently review the evidence, there is clear and convincing evidence the threats were not analogous to poems, paintings, or jokes but were designed to make Kyle ever more compliant and unwilling to disclose the abuse he suffered.  In other words, defendant's statements were "true threats" undeserving of protection under the First Amendment and ample evidence under any standard of review to support the jury's conviction.  To suggest otherwise is to demean the First Amendment and the important values it is designed to protect.

Penal Code former section 422 provides, in part:  "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another

34

person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

"[T]he state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. [Citations.] In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is ' "communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . ." ' [Citation.] As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression. [Citation.] . . .

"A threat is an ' "expression of an intent to inflict evil, injury, or damage on another." ' [Citation.] When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection." (*In re M.S.* (1995) 10 Cal.4th 698, 710.)

We return once again to context. The victim is a 16-year-old boy. Defendant urges us to dissect the record and conclude, as he does, that it is plausible he made the threats before the beating, burning, mayhem, and torture really began in earnest in the last

35

few months before Kyle escaped. His theory of plausibility rests entirely on timing, for even he must recognize that a person who beats and burns his victim and/or observes his neighbors torturing him has strayed as far as possible from First Amendment protection when he thereafter threatens to kill him. We reject defendant's cribbed reading of the record and conclude there is clear and convincing evidence to support the inference that defendant made the threats in the midst of the violent treatment of Kyle.

There is overwhelming evidence that Carmen never stopped abusing Kyle. We know Kyle was taken to a receiving home after Carmen was arrested for child abuse. Once reunited, the abuse resumed. Thus, it is but raw speculation that defendant was unaware of the abuse until August of 2008, when, in fact, the boy had been beaten on a regular basis.

Moreover, Kyle testified he escaped because it was "now or never." He explained that he ran because he believed he "was probably going to die that night." He had good reason for that belief given that he had been beaten and burned with a bat, zip-tied and chained, sliced with a knife, and clawed with a meat cleaver, not to mention expressly threatened that he would be killed. The jury could reasonably infer the threats were made during the time defendant either knew Kyle was being abused or while he was abusing the boy himself.

Finally, even if he made the threat before he actually observed or perpetrated the violence, a reasonable person would have realized that a young boy in Kyle's circumstances would have taken his threat seriously. The statute expressly states that the defendant did not need to intend to carry out the threat at the time it was made, so even if he did not then plan to execute on his threat he certainly would have realized that this isolated boy would have been "in sustained fear for his . . . own safety." In short, the timing issue is nothing but another red herring, interesting in the abstract but absurd under the dreadful circumstances Kyle was in.

# IV.

## *Prosecutorial Misconduct*

In closing argument, the prosecutor meticulously marshaled the evidence in support of each of the charges of which defendant stood accused, reserving her analysis of the torture count for last. Defendant accuses her of advancing a legally untenable theory of torture and urges us to reverse for prosecutorial misconduct. We find the prosecutor did not use any deceptive or reprehensible method in trying to persuade the jury (*People v. Morales* (2001) 25 Cal.4th 34, 44), nor did her argument infect the trial with such unfairness as to make the conviction a denial of due process (*People v. Hill* (1998) 17 Cal.4th 800, 819, 827-828). To the contrary, her argument was a fair comment on the abundant evidence that defendant aided and abetted his neighbors' torture of Kyle for a sadistic purpose. There was no misconduct.

The jury was instructed on the elements of torture as follows: "The defendant is charged in Count 1 with torture in violation of Penal Code section 206.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant inflicted great bodily injury on someone else;

"AND

"2. When inflicting the injury, the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, persuasion, or for any sadistic purpose.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"It is not required that a victim actually suffer pain.

"Someone acts with a sadistic purpose if he or she intends to inflict pain on someone else in order to experience pleasure himself or herself." (CALCRIM No. 810.)

The prosecutor's theory was not, as defendant argues, that he was criminally liable for failing to act, but rather that he aided and abetted his neighbors' ongoing torture of Kyle when he was not torturing the boy himself. As a result, she chronicled all that

37

occurred in the Schumacher household, beginning with a catalogue of the crimes defendant perpetrated on his own and ending with a description of other evidence of the torture he aided and abetted.

Because the theory of aiding and abetting was at the heart of the prosecution's case against defendant for torture, it is helpful to consider the basic principles undergirding that doctrine. The doctrine of aiding and abetting " ' "snares all who intentionally contribute to the accomplishment of a crime in the net of criminal liability defined by the crime, even though the actor does not personally engage in all of the elements of the crime." [Citation.]' [Citation.] Aiding and abetting does not require participation in an agreement to commit an offense, but merely assistance in committing the offense. [Citation.]" (*People v. Morante* (1999) 20 Cal.4th 403, 433.) However, "if a person in fact aids, promotes, encourages or instigates commission of a crime, the requisite intent to render such aid must be formed *prior to or during* 'commission' of that offense. [Citations.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) This does not mean advance knowledge is a prerequisite for liability (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 742); "[a]iding and abetting may be committed 'on the spur of the moment,' that is, as instantaneously as the criminal act itself. [Citation.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 532). Moreover, "it is not necessary that the primary actor expressly communicate his criminal purpose to the defendant since that purpose may be apparent from the circumstances. [Citations.]" (*Id*. at pp. 531-532.)

The prosecutor began with the two counts of aggravated mayhem; the first when defendant branded Kyle with his bat and the second when he ground the knife back and forth across his forearm. As to the first count, she argued that defendant demonstrated an extreme indifference to Kyle's pain. He placed the bat on Kyle's bare back while chained and watched his skin burn. As to the second count, she argued: "So when you take a knife and you slice it, not just a little accidental jabbing, you intentionally slice it

38

like you are cutting a steak, you have the intent . . . that's permanent. Your intent is to injure the flesh permanently."

The prosecutor pointed out the long-term nature of the abuse and explained to the jury that some of the counts were simply representative of a course of conduct. For example, defendant was charged with the infliction of corporal injury on a child, but there were a host of incidents upon which the jury could find him guilty of the charge. The prosecutor stated, "The twelve of you have to say, okay, we agree that on an occasion -- you don't have to be date specific . . . [defendant] used the bat, hit Kyle, created a nosebleed, or created the loss of the use of his body part, or split his head open, [etc., etc.]"

And she proceeded through all of the counts, attempting to persuade the jury that there was ample evidence to prove each and every element of each and every crime. Then she came to torture and, by way of introduction, made the statement defendant objects so vehemently to on appeal. She began, "Torture. Okay, now we are back to Count 1. I call it the umbrella charge because it encompasses or covers everything that was going on by Michael Schumacher, Kelly Lau, Carmen Ramirez and Anthony Waiters. This is kind of the all inclusive charge as to all of their conduct. As I've said, it's a continuous course of conduct crime, and based on testimony by Kyle, the charging document just alleges January 1st, 2008, until the day he escaped. Did it start January 2nd, January 3rd, with Carmen and Kelly, as he said, beating him and then it escalated? There is not a definitive date. It just started. At some point it went from, perhaps, child abuse, to felony child abuse, to infliction of great bodily injury, and ultimately torture. That's why it's a continuing course of conduct crime. It escalated and eventually everything that happened to this child was torture."

Defendant contends that the prosecutor thereby advanced a legally untenable theory which sought to hold him responsible for all injuries and suffering inflicted on Kyle by members of his household—even injuries they inflicted when defendant was not

39

present and was not aware of what they were doing. Defendant insists the prosecutor's argument constituted misconduct because he had no special duty to either protect Kyle or control his neighbors, and in the absence of a duty, there were no legal grounds for holding him responsible for the abuse the others committed. (*People v. Heitzman* (1994) 9 Cal.4th 189, 197.)

We agree with the Attorney General that defendant misconstrues the prosecutor's argument. Her theory was aiding and abetting torture, not a failure to act based on a special duty. But in context, her opening remarks do not constitute an untenable legal basis at all. Rather, they set the stage for a persuasive and effective argument demonstrating why the jury should convict defendant of torture, based not only on the great bodily injury he personally inflicted, but on the torture the others inflicted as well.

The prosecutor argued that the evidence satisfied each of the elements of torture, beginning with great bodily injury. ". . . Kyle was scarred, starving, soot covered, shackled, bloody and burned. He was scarred on his head, and on his arms, on his back, on his ankle. He was starved, he was an emaciated prepubescent sixteen-year-old boy. He was soot covered, head to toe . . . . He was shackled with a chain, a 4.6 pound chain. His arm and back were bloody, and he was burned, visibly burned, severely on his elbow, on his lower abdomen, and down his back."

She also pointed out the absurdity of the notion that defendant did not know what was going on or that he did not enjoy the torture. Facetiously she argued, "How do you walk in, hi, neighbor. Oh, the kid is chained to the table? Hmm, okay. When I come back, I'll bring a bat." And to the prosecutor, that raised the very reasonable inference that defendant received some sadistic pleasure out of the torture. "[Defendant] was the neighbor. He didn't live there. He didn't have to be there. . . . And he keeps coming back for more."

The prosecutor never suggests that defendant should have intervened and that his failure to do so made him vicariously liable for the neighbors' torture of the boy. Rather,

40

she explained that the theory of aiding and abetting applies to both torture and false imprisonment. She argued that all the facts and circumstances "circumstantially show that [defendant] knew what was going to happen to Kyle[.]" Of course, such proof was critical to proving aiding and abetting, which requires the defendant to "act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

Defendant picks apart the prosecutor's argument, extracting bits and pieces purportedly to demonstrate her misconduct. We do not find any of the excerpts, when put into context, offensive, unsupported, or based on an erroneous legal basis. We examine defendant's objections to her argument.

He objects to her argument that he is responsible for the beatings of Kyle when he was not there. But, as the prosecutor reminded the jury, defendant was the one who supplied the bat and told Carmen to use it. If that was not enough, he demonstrated how to use it effectively, for according to Kyle, defendant routinely beat him with the bat. Based on this evidence, the prosecutor's argument that he was responsible for the beatings he encouraged was fair comment on the evidence.

Defendant next complains that the prosecutor argued he was also responsible for the burns to Kyle's elbow he received in the fireplace after Kelly choked him with a belt. The prosecutor argued, "That wound was so completely visible, he told you, you heard, I thought my bones were sticking out, I thought my arm was broken, and Anthony Waiters may have not been there that day, but he had helped encourage and promote such an environment that that could happen to Kyle and nobody thought twice about it." But, as the Attorney General points out, the defense objection to this argument was sustained.

Nevertheless, defendant objects to the prosecutor's use of the "umbrella theory." He claims he was not responsible for Kyle's burning his elbow in the fire when he was not there, nor was he responsible for Carmen's use of the meat cleaver on Kyle's back on

41

the day of his escape. The prosecutor used these incidents as yet more examples of the torture Kyle endured, defendant's knowledge of what was occurring at the Schumacher residence, and his contribution to facilitating it. That is not to say defendant preplanned each incident or conspired with his neighbors in advance of each act of torture. What the prosecutor was arguing was much broader—that defendant was keenly aware Kyle was being tortured on an ongoing basis even while chained, that in supplying the bat and the meat cleaver he facilitated that torture, and that he not only intended Kyle continue to be tortured, but he enjoyed some sadistic pleasure in the knowledge that he was. In essence, although he did not live in the house of horrors himself, he helped create the torture chamber, supplied the implements to be used, and enjoyed the entire enterprise. The jurors, of course, were at liberty to accept or reject the inferences the prosecutor urged them to draw. But we find the prosecutor's argument was fair advocacy that did not rely on an erroneous legal basis. There was no misconduct.

## V.

## Sentencing

### A. *Penal Code Section 654*

The alleged prosecutorial misconduct issue provides a nice segue into defendant's contention that he was punished twice for the same conduct in violation of Penal Code section 654, because we must once again closely scrutinize the prosecutor's closing argument to determine whether the trial court abused its discretion by punishing him for torture and the many individual counts. Defendant uses the same excerpts from the closing argument that the torture count constituted the "umbrella charge" and that torture "is kind of the all inclusive charge as to all of their conduct" to demonstrate the prosecutor relied on the same conduct in urging the jury to convict on all charges. A prosecutor's election, he reminds us, concerning the factual basis for each count controls in the determination whether section 654 applies. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1345-1346.)

42

Penal Code section 654, subdivision (a) provides, in pertinent part: "an act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"Whether [Penal Code] section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

" ' "[I]f all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." [Citation.]' [Citation.]" (*People v. Spirlin* (2000) 81 Cal.App.4th 119, 129.) However, if the defendant harbored "multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct. [Citation.]" (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267-268.)

Here the question is whether the trial court abused its discretion by implicitly finding that defendant harbored independent multiple objectives when he committed aggravated mayhem, corporal injury on a child, child abuse, false imprisonment, criminal threats, and assault with caustic chemicals and also aided and abetted Kyle's torture. Because there is substantial evidence to support the trial court's sentence, we cannot say the court abused its discretion. The prosecutor telegraphed the conduct she was relying

43

on to support each count during her closing argument, an argument that makes our job considerably easier in resolving the double punishment claim.

First, we must disagree with defendant's premise. He berates the prosecutor's choice of language in referring to the torture count as the "umbrella charge" and referring to the "all inclusive" nature of the charge. According to defendant, the prosecutor's sweeping language constituted a fatal election to designate all of his criminal conduct as torture. We do not understand her argument to mean that she based the torture on the identical conduct on which she based the individual counts. In fact, we believe a more reasonable interpretation of her arguments leads to the opposite conclusion—she carefully selected specific events to support the individual counts, which she methodically described, and relied on different incidents or different objectives to support the torture count. In other words, she structured her argument so that the jury clearly understood how defendant personally perpetrated each of the individual crimes and concluded with a course-of-conduct crime that included other incidents he perpetrated and many more that he aided and abetted.

The prosecutor identified two occasions when defendant personally maimed Kyle: the first, constituting count two, referred to defendant's burning Kyle with the aluminum bat, and the second, constituting count four, encompassed defendant's slicing of Kyle's arm with the knife. In closing, the prosecutor did not mention the knife incident when describing the conduct that constituted torture. She did refer to Kyle's burns and scars, but she distinguished between defendant's personal conduct and his responsibility for aiding and abetting the others. She argued: "You put the bat in there and you take turns burning this child. So when [defendant] held the bat, is he responsible for the bat? Absolutely. When he handed the bat to Carmen or Kelly or Michael, whoever, and they burned Kyle, is [defendant] responsible for that? Yes."

The crux of the prosecutor's argument regarding torture was aiding and abetting. She stated plainly, "[D]efendant did not have to be there. He helped create the

44

environment, he facilitated, promoted and encouraged it for these injuries to occur, even outside of his presence."

As to count seven, the prosecutor emphasized that defendant had only been charged with one count of hitting Kyle with the bat despite his testimony that defendant regularly beat him with the bat several times a week. She admonished the jury to agree on one incident. The many other beatings over several months are more than ample to support the torture charge, separate and apart from count seven.

Count eight involved the time defendant struck Kyle with a boxing glove. The prosecutor did not rely on this incident in arguing torture to the jury.

To support a conviction of child abuse as alleged in count nine, the prosecutor did mention the incident in which defendant poured bleach on Kyle's knife wound, but not to prove that the conduct was torture. Rather, she provided the jury with a litany of examples of the collective behavior that demonstrated the cruel intent necessary to find torture, including treating wounds with a cocktail of bleach, salt, and butter, and administering hot candle wax or glue to the abrasions Kyle suffered on his head, and failing to seek medical care or to call 911, and beating Kyle while he was shackled or zip-tied, and putting him on the bricks of the fireplace without a blanket or pillow, and forcing him to urinate and defecate on himself, and not allowing him to shower or to eat much besides alcohol and marijuana. All of this conduct, the prosecutor insisted, was designed to humiliate him.

As for the false imprisonment count, the prosecutor relied on an aiding and abetting theory. She maintained that defendant was as guilty as his neighbors for the fact Kyle was chained to the table next to the fireplace. In arguing torture, she did mention the chains but in the context of Kyle's humiliation in being chained and required to defecate and urinate on himself, cruelty far beyond the mere restraint necessary to confine him.

The prosecutor explained how defendant had threatened to chop up Kyle and throw him into the "Delta River" to support the criminal threat charge set forth in count eleven. She never mentioned the threats in arguing torture to the jury.

And finally, the prosecutor told the jury that when defendant poured lighter fluid on Kyle he committed the crime of assault with a caustic chemical (count twelve). Her only reference to Kyle's sitting in lighter fluid was again in demonstrating the foursome's cruel intent. She recounts, "Kelly is cooking the meal, [defendant] comes over, these terrible thing[s] happen, he is sitting there in the lighter fluid, letting it soak up, while they are cooking turkey and mashed potatoes and pumpkin pie and stuffing." She did not elect the conduct to constitute both torture as well as assault.

In sum, there is, as the Attorney General points out, an abundance of physical and mental abuse of Kyle by defendant that was not encompassed in any of the other counts and was more than sufficient to support the torture charge. The prosecutor effectively selected other incidents of abuse to substantiate the torture count. As a result, the trial court was well within its discretion in sentencing defendant for torture and the other crimes. There was no double punishment for the same conduct.

Finally, defendant argues that he could not be punished for both aggravated mayhem and child abuse for the same conduct. But the two counts did not necessarily involve the same conduct. The prosecutor argued that the mayhem involved defendant's slicing Kyle's arm, whereas the child abuse involved the separate act of pouring bleach on the wound after it was inflicted. While it is true that all of defendant's macabre conduct could fall within the rubric of torture and mayhem, it is also true that the court could find he entertained an objective in slicing his arm, separate from the subsequently formed intent to exacerbate the pain by pouring bleach into the wound. Again, we cannot say the court abused its discretion.

46

**B.** *Administrative Surcharge*

The Attorney General concedes that the $1,000 administrative surcharge to his restitution fine must be stricken because it was not part of the trial court's oral pronouncement of judgment. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 386-387.) As we held in *Zackery*, "The clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment." (*Id.* at pp. 387-388.) We will order the administrative surcharge stricken.

## DISPOSITION

The administrative surcharge is stricken. The trial court is directed to prepare an amended abstract of judgment and to send a certified copy thereof to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

                                                   RAYE , P. J.

We concur:

NICHOLSON , J.

ROBIE , J.